RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 05a0144p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

WAYNE LEE BATES,

*Petitioner-Appellant,*

*v.*

No. 02-6436

RICKY BELL, Warden,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Eastern District of Tennessee at Winchester.
No. 98-00045—Thomas G. Hull, District Judge.

Argued: September 22, 2004

Decided and Filed: March 23, 2005

Before: MERRITT, BATCHELDER, and MOORE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Stephen M. Kissinger, FEDERAL DEFENDER SERVICES, Knoxville, Tennessee, for Appellant. Alice B. Lustre, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. **ON BRIEF:** Stephen M. Kissinger, FEDERAL DEFENDER SERVICES, Knoxville, Tennessee, for Appellant. Alice B. Lustre, Gordon W. Smith, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.

MERRITT, J., delivered the opinion of the court, in which MOORE, J., joined. BATCHELDER, J. (p. 15), delivered a separate concurring opinion.

_____

## OPINION

_____

MERRITT, Circuit Judge. Wayne Lee Bates was sentenced to death by a jury in the Criminal Court for Coffee County, Tennessee, after pleading guilty to first degree murder. After state post-conviction proceedings ended, he sought habeas relief, which was denied in the District Court. On appeal, Bates challenges the voluntariness of his guilty plea and the constitutionality of his sentencing hearing. As the record does not support Bates's contention that his plea was entered unknowingly or involuntarily, his conviction must stand. We do, however, find merit in Bates's claim of prosecutorial misconduct and conclude that Bates death sentence must be vacated. We therefore AFFIRM in part and REVERSE in part.

In the present case, the jury was prevented from giving proper consideration to mitigating circumstances that may have led the jury to reject the death penalty. The state prosecutors engaged in prejudicial misconduct in violation of the Due Process Clause. In closing argument at the sentencing phase of the trial, the state prosecutors repeatedly told the jury that by "permitting" Bates to live they would "become an accomplice" to the murder and an accomplice to future crimes, because Bates is a "rabid dog" to whom they will be issuing a "warrant of execution for someone else." Suggesting that a vote for a life sentence for Bates was a vote for a death sentence for others was a continuing refrain throughout the final argument. The prosecutors frequently followed these expressions with their negative personal opinions about Bates's expert witness and with personal attacks against Bates's lawyers. On appeal, the Tennessee Supreme Court criticized the prosecutors for not following "disciplinary rules." It referred to their conduct as "clearly improper," "inappropriate," and "certainly uncalled for." The misconduct poisoned the atmosphere of the sentencing hearing and amounted to a denial of Bate's rights to due process of law. His death sentence arising from this fundamentally unfair hearing cannot be permitted to stand.

## I. Background

### A.

On July 20, 1986, Bates escaped the custody of authorities in Allen County, Kentucky, where he had been charged with first-degree burglary, possession of stolen property, and two misdemeanors. Two days later, he broke into a residence in Simpson County, Kentucky, and stole several items including a .410-gauge single-barrel shotgun. After sawing off the stock and barrel of the gun, he hid the weapon in a suitcase stolen from the residence. On July 23, 1986, Bates was at an exit off Interstate 24 in Manchester, Tennessee, where he was planning to steal an automobile. Julie Guida, a 28-year-old mechanical engineer from Utah who was staying at the Manchester Holiday Inn, was jogging in the area of the interstate exit. Bates pulled the stolen shotgun and confronted Guida. After a brief struggle, he walked her into the woods off the jogging trail. Using her shoelaces and the headphone cord from her portable radio, Bates tied her to a tree. To prevent her from crying out, Bates attempted to gag Guida with one of her own socks. Bates told Guida that he was going to leave her there while he took her car. Then without warning, he shot her once in the back of the head, killing her instantly.

After hiding her body under some brush, Bates returned to Guida's hotel room, where he showered, shaved, and ate some fruit. Bates then departed in Guida's rental car, taking her money and traveler's checks. He drove east across Tennessee, heading for his home in Maryland. At a Bristol, Tennessee truck stop, he picked up two hitchhikers, who assisted him in using Guida's traveler's checks to pay for food and other items. On July 26, 1986, Bates was arrested on an unrelated offense in Baltimore, Maryland. Tracing the traveler's checks stolen from Guida, the Tennessee authorities eventually identified Bates as a suspect. While he was being held in Maryland, Bates was questioned multiple times. He made two statements of confession to the murder, both of which are contested by Bates as inadmissible.

### B.

On August 20, 1986, following the July 26 arrest, Federal Bureau of Investigation ("FBI") agents interviewed Bates regarding the interstate transportation of a stolen vehicle and the possible kidnapping of Guida. He was properly advised of his right against self-incrimination and his right to counsel, but he refused to sign the acknowledgment form. After the agents informed him that several witnesses had seen him in the stolen vehicle and showed him a picture of Guida, Bates told the agents, "I believe I need a lawyer." The agents ended the interrogation and returned Bates to jail. No effort was made to afford him access to an attorney over the next thirteen days. *See State v. Bates*, 804 S.W.2d at 872.

On September 2, 1986, representatives from the Tennessee Bureau of Investigation ("TBI") and the Coffee County District Attorney's office interrogated Bates for over five hours. They did so despite having been informed by the FBI that Bates had requested an attorney. During the questioning, he confessed to shooting Guida. This confession was captured on audio tape. Nine days later, on September 11, 1986, an FBI agent was collecting hair samples from Bates pursuant to a court order. Bates, who had still not been provided an attorney, told the agent that he did not understand why they were collecting hair samples as he had already confessed to the shooting. The FBI agent presented Bates with an advice of rights form and waiver which Bates signed. Bates then confessed a second time. Bates also confessed the murder to Paul Carter while both men were confined in the Coffee County jail. The Tennessee Supreme Court later ruled that the first confession should have been excluded from the record, but found its admission harmless error as these subsequent confessions were valid and substantially tracked the tainted confession.[1]

C.

Bates moved to suppress the confession. After the trial court denied his motion to suppress, Bates pled guilty to murder in the first degree and to grand larceny, preserving his right to appeal the admission of the confessions. The Coffee County prosecutors sought the death penalty. For a defendant to be executed in Tennessee, the jury must determine after a special sentencing hearing whether the death penalty is appropriate. In doing so, the jury must determine whether or not the state has proven the existence of particular statutory aggravating circumstances, and, if so, weigh those aggravating factors against any mitigating evidence. During the sentencing trial, the prosecutors attempted to prove the existence of three statutory aggravating circumstances:

1. The defendant was previously convicted of one or more felonies, other than the present charge, which involve the use or threat of violence to the person;

2. The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and

3. The murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any burglary, robbery, larceny or kidnapping.

Additionally, the prosecutors argued that Bates would continue to be a danger to society. In response, defense counsel for Bates attempted to demonstrate the existence of mitigating circumstances. Specifically, the defense pointed to the three following statutory mitigating factors:

1. The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance;

---

[1] Bates contends that this first, improperly admitted confession prejudiced his sentencing hearing where the issue was not whether he was guilty or innocent of the murder, but whether he should be sentenced to death or to life in prison without parole. He claims that while the two later confessions contained some of the same factual elements, they differed markedly from the first confession in that the first confession contained more detail, included more compromising information, and allowed the jury literally to hear Bates describe the events in question. Unlike the subsequent confessions, the first, inadmissible confession was taped. Through this tape, the jury heard Bates *in his own voice*, discuss in chilling detail (laden with expletives and including at least one racial slur) the actions he took, and the other crimes he committed, in the days before and after his cold-blooded murder of Julie Guida. In the context of the sentencing phase as opposed to the guilt phase, Bates maintains that the content, form, and tone of this improperly-admitted, taped confession had a substantial effect on the jury's decision to sentence him to death. As we are vacating the death sentence on prosecutorial misconduct grounds, we need not decide this issue.

2.      The capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication which was insufficient to establish a defense to the crime but which substantially affected his judgment; and

3.      The defendant acted under extreme duress or under the substantial domination of another person.

In support of their case of mitigation, the defendant's mother, Helen Bates, and a psychiatrist, Dr. John Griffin, testified on his behalf. Helen Bates testified regarding the troubled childhood of Wayne Lee Bates. She indicated that lung and bowel development complications appeared immediately after his birth and that he had recurrent health problems. She discussed his early behaviors of violent rocking and aggression toward his sibling. Ms. Bates testified to the culture of violence in which he was raised. Bates's father abused her, often in the presence of the children, and on one occasion broke her arm. She testified that his father took his younger sister into another room and played "Russian Roulette" with her. At one point during the defendant's childhood, Ms. Bates shot her husband. Although Bates's father was not fatally wounded, he died from an overdose of pain medication after returning from the hospital. Ms. Bates testified that she had attempted to commit suicide as well. After Bates's father died, she became involved with another abusive man. The two of them were in a motorcycle gang, carried weapons, and regularly abused alcohol and drugs. After kicking this man out of her home, she married a third man, who had mental health and substance abuse problems. This man sexually assaulted her daughter and was eventually shot by the police in the couple's front yard.

According to Bates's mother, Bates rarely attended school as a child due to illness, and was frequently in trouble for fighting when he did attend. She testified as a child he was antisocial and hyperactive, often hurting and robbing others. Bates never progressed past the third grade. When he was repeating third grade, he was removed for burglarizing the school. During his youth, he was in and out of juvenile institutions. At age 18, Bates was sentenced to ten years in prison. Upon his release, he returned to live with his mother. She testified that his violent behavior continued.

Dr. Griffin, a psychiatrist, testified that Bates had serious health, behavioral, and substance abuse problems as a child. He highlighted that Bates exhibited an unusual degree of violence and antisocial behavior as a child and that he had started using drugs and alcohol as early as age six or seven. Dr. Griffin testified that childhood testing revealed evidence of brain damage and hyperactivity. His IQ was in the low normal range. The psychiatrist stated that Bates suffered from depression and hyperkinetic, minimal brain dysfunction. Additionally, Dr. Griffin noted that Bates adopted violence as his method for dealing with life due to witnessing excessive violence as a child. Dr. Griffin also noted that Bates had been diagnosed with an antisocial or mixed personality disorder. The State called Dr. Willis Marshall, a psychiatrist in rebuttal. While the two psychiatrists' testimony diverged, Marshall did agree that Bates demonstrated minimal brain dysfunction and was properly diagnosed with an anti-social personality disorder with some paranoid tendencies.

After deliberations, the jury sentenced Bates to death. The jury found that each of the three proffered aggravating circumstances was proven beyond a reasonable doubt. It is impossible from the jury verdict forms used in Tennessee to determine the jury's finding as to the existence of mitigating circumstances. His death sentence was affirmed on appeal. On habeas review, Bates brings multiple challenges to the fairness of the proceedings and consequent appropriateness of the death penalty. After reviewing the record, we find a significant constitutional error in the Coffee County sentencing hearing that requires Bates receive a new penalty phase trial.

## *II. Prosecutorial Misconduct*

Bates claims that his sentencing hearing was fundamentally unfair due to the improper and egregious conduct of the prosecution. Specifically, Bates contends that Kenneth Shelton and Charles (Buck) Ramsey, the Coffee County prosecutors, (1) improperly incited the passions and prejudices of the jury, (2) injected their personal beliefs and opinions into the record, and (3) inappropriately criticized Bates's counsel for objecting to their improper arguments.

### A.

On habeas review, "[t]he relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416, U.S. 637, 643 (1974)). "Even if the prosecutor's conduct was improper or even universally condemned, we can provide relief only if the statements were so flagrant as to render the entire trial fundamentally unfair." *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003). Yet reversal is required if the prosecutor's misconduct is "so pronounced and persistent that it permeates the entire atmosphere of the trial or so gross as probably to prejudice the defendant." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997); *see also Gall v. Parker*, 231 F.3d 265, 311 (6th Cir. 2000), *overruled on other grounds by, Bowling v. Parker*, 344 F.3d 487, 501 n.3 (6th Cir. 2003)

In order to obtain relief, Bates must demonstrate that the prosecution's conduct was both improper and so flagrant as to warrant reversal. *Mason v. Mitchell*, 320 F.3d 604, 635 (6th Cir. 2003). If this Court finds improper conduct, four factors are considered in determining whether the challenged conduct is flagrant: (1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant. *See Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004); *Bowling v. Parker*, 344 F.3d 487, 512-13 (6th Cir. 2003); *Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982) (en banc) (citing *United States v. Leon*, 534 F.2d 667, 677 (6th Cir. 1976)). Under AEDPA, we are required to give deference to the Tennessee Supreme Court's determination of Bates's prosecutorial misconduct claims. *See Macias v. Makowski*, 291 F.3d 447, 453-54 (6th Cir. 2002) (noting that habeas relief is only appropriate if there "was an unreasonable application of clearly established federal law"); *see also Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) ("Claims of prosecutorial misconduct are reviewed deferentially on habeas review."). In determining whether prosecutorial misconduct mandates habeas relief, we apply the harmless error standard. *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997). An error is found to be harmless unless it "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).

In the context of a death penalty sentencing hearing, however, the question of error or effect is more complex than in traditional trials. Rather than determining whether a constitutional error would have pushed a jury from a "not guilty" verdict to a "guilty" verdict, we must attempt to discover whether the constitutional error influenced the jury's decision between life and death.

### B.

Without question, the behavior of the prosecution during Mr. Bates's sentencing hearing was highly improper. Advocates have an obligation to treat the court and each other respectfully and to put forth only proper arguments based on the evidence in the record. The prosecutors in this case failed to meet their professional obligations. They (1) improperly incited the passions and prejudices of the jury, (2) injected their personal beliefs and opinions into the record, and (3) inappropriately criticized Bates's counsel for objecting to their improper arguments. Bates's

attorneys have challenged this misconduct in their trial objections, in their direct appeal, and in this habeas proceeding.

       *1. Inciting the Passions and Prejudices of the Jury.* The closing argument of the prosecution was riddled with wildly inappropriate and inflammatory remarks in violation of what this Court has described as "the cardinal rule that a prosecutor cannot make statements 'calculated to incite the passions and prejudices of the jurors.'" *Gall*, 231 F.3d at 315 (quoting *United States v. Solivan*, 937 F.2d 1146, 1151 (6th Cir. 1991)); *see also Stumbo v. Seabold*, 704 F.2d 910, 912 (6th Cir. 1983) (denouncing statements which "tend[] to prejudice and inflame the jury."). Throughout the summation, the Coffee County prosecutors continually told the jury that they would "become an accomplice" to his crime by "permitting this man to live," and argued that the jury would be responsible for the future deaths of others if they opted to sentence Bates to life imprisonment rather than death:

> By permitting this man to live, we in essence become an accomplice. We have assisted him in his criminal undertaking. *If you, based on the law and the facts of this case, choose not to execute the defendant, you have passively issued a warrant of execution for someone else.* We don't know who it is. We don't know when it will take place; but ladies and gentlemen, I think you can see from the proof in this case that the only thing that will be left out of that warrant of execution that someone else is to receive, if this man lives, is the name of the victim and the date that it takes place. This man is going to kill again if he is not stopped first, and I think that is obvious to each of you. Even his own psychiatrist, hired by them and paid for by us, even Dr. John Griffin tells you, "This man is going to kill again as he deems it necessary in his own framework of what he thinks is right." *Where is fundamental fairness in that, to let this man live and, in essence, to sentence someone else to die? If he goes to the state penitentiary under a life sentence and he is permitted to be among the general population in the facility where he is going to be housed, by your actions of voting for life for him, you are voting for death for someone else.* Where is the fairness? Where is the justice in permitting him to go down and execute some individual who is in the penitentiary for grand larceny? Grand larceny never has been and never will be a capital crime in this state. Sure, the men in the penitentiary are criminals, and some of them have committed the act of grand larceny or some other felony offense. Sure, he has an obligation to serve a sentence. He must be punished, but he doesn't deserve the death penalty. *Don't let Bates be his executioner.*
>
> ***
>
> Prisoners do escape, you know; and this prisoner here–this defendant–must have a rather advanced ability and knowledge of escape. . . . Where is the fairness in voting to give this man life and, in essence, inflicting the death penalty on perhaps one or more other individuals in society? This man killed because he was in the course of escape on July 23, 1986. Do you think, as you look over the facts in this case, there is anything, ladies and gentlemen, that will ever inhibit him from killing again if he escapes? I think not, and I believe that you share that feeling also. There are other people in the penitentiary system that deserve our protection: the administrative staff there, the guards that oversee these individuals. *Please don't vote for life for him and death for them.*

Apx. 1497-98, 1498 (emphasis added). The prosecutors repeatedly referred to the near-certain murders that would occur if Bates were permitted to live:

The crime was committed by the defendant while he was in lawful custody. That's when you kill prison guards, that's when you kill jail personnel, and I think that is something that maybe we can look forward to from the defendant in his next case, if he is allowed to live–

\*\*\*

Please don't put Wayne Lee Bates back in the general population of the prison of the State of Tennessee and allow him to escape and come out and execute someone else like he executed Julie–

Apx. at 1500-01, 1515-16. Repeatedly through the arguments, they suggested that giving Bates a life sentence was equivalent to placing a gun in his hands to kill again:

If you are going to find life imprisonment for Wayne Lee Bates  because he is depressed, then take him, give him back his gun that he stole from Curtis Mayes, and let him take it to the penitentiary with him. . . .  It might solve the overcrowding problem in prison if you put Wayne Lee Bates down there with his gun, but it is sure not the right thing to do . . . .

\*\*\*

If that is justification for voting life imprisonment, then give Mr. Bates the shotgun that he stole from Mr. Curtis Mayes and let him take it to the penitentiary with him. He will put it to good use.

\*\*\*

If that justifies his taking Julie Guida's life because he was hyperactive when he was a little baby, then let him have his gun back and let him take it to the penitentiary so he can kill again.

Apx. 1506-07, 1507, 1510-11.

Beyond suggesting that the jury would be an accomplice to future murders if they failed to sentence Bates to death, the prosecutors also compared him to a rabid dog:

Ladies and gentlemen, there is an old saying out in the country that there is no cure for a rabid dog. Wayne Lee Bates is a rabid dog. There are dogs that become rabid that might be your favorite pet, and you might love them to death; but once they do become rabid, it's a fact that if they bite someone, the other animal or person is going to die. Wayne Lee Bates killed Julie Guida; and his own Dr. Griffin said, "He'll kill again."  Please don't put Wayne Lee Bates back into the general population and allow him to escape and come out and execute someone else like he executed Julie Guida–

Apx. 1515-16. Ramsey continued, "[h]e is abnormal because he is mean. He's just like a rabid dog." Apx. 1516. As the Tennessee Supreme Court suggested, comparing a defendant to a rabid dog in a death penalty sentencing hearing was "patently improper." *Bates*, 804 S.W.2d at 881. In a shocking display of self-aware defiance of prosecutorial ethics, General Ramsey in his closing argument addressed one of Bates's attorneys as follows:

Mr. Peters, you can call it an appeal to the fears of an individual, you can call it emotion, or you can call it any darn thing you want to; but it's a fact of life that there

are other people in the penitentiary and out in the world who have children.  The people in the penitentiary and out in the world have children.  The people in the penitentiary system are adults, but they are the children of somebody.  They might be down there for selling marijuana or even stealing a car to joyride, but they have a chance to make something out of themselves when they get out.  They have a right to live free of fear of the Wayne Lee Bates' of the world.  They have a right to live free of fear of being shot or some type of violent act.  There are correctional guards who have children and families who have a right to be free of fear of that.  I just don't think that those people should be subjected to Wayne Lee Bates.

Apx. 1513.  Throughout the summation, the prosecutors did appeal to the fears of individual jurors and to emotion.  They repeatedly argued that the jurors would be responsible for the murders that Bates would inevitably commit unless sentenced to death.  The prosecutors suggested that failing to support the death penalty for Bates would make them "accomplices" to his crime and to future crimes.  Their conduct was clearly improper.

　　*2. Assertions of Personal Opinion or Personal Knowledge.*  It is well-established law that "a prosecutor cannot express his personal opinions before the jury." *United States v. Galloway*, 316 F.3d 624, 632-33 (6th Cir. 2003).  "'[I]t is improper for a prosecuting attorney in a criminal case to state his personal opinion concerning the credibility of witnesses or the guilt of a defendant.'" *Byrd v. Collins*, 209 F.3d 486, 537 (6th Cir. 2000) (citing *United States v. Krebs*, 788 F.2d 1166, 1176 (6th Cir. 1986); *United States v. Daniels*, 528 F.2d 705, 709 (6th Cir. 1976)).  In the capital sentencing context, prosecutors are prohibited from expressing their personal opinion as to the existence of aggravating or mitigating circumstances and the appropriateness of the death penalty. Jurors are mindful that the prosecutor represents the State and are apt to afford undue respect to the prosecutor's personal assessment.  As Justice Sutherland long ago noted:

> The [prosecuting attorney] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, [the prosecutor] is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor--indeed, he should do so. But, *while he may strike hard blows, he is not at liberty to strike foul ones*. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.  It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. *Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.*

*Berger v. United States,* 295 U.S. 78, 88 (1935) (emphasis added).

　　Bates points to at least nine instances of the Coffee County prosecutors expressing their personal opinion as to either the credibility of the witnesses or the ultimate issue in the hearing. Notably, the personal opinions or assertions of personal knowledge all addressed the mitigating evidence of the defense.  Bates had put forth only two witnesses: his mother, Helen Bates, and a psychiatrist, Dr. John Griffin.  After the direct examination of Helen Bates, defense counsel requested that she be given "a few minutes to compose herself" before cross examination."  To which, General Shelton responded, "After a performance like that, I can understand why."  Apx. 1373.  The prosecutors remarks, characterized as "indefensible" by the Tennessee Supreme Court,

*Bates*, 804 S.W.2d at 881, clearly suggested Shelton believed she was being untruthful. *See United States v. Francis*, 170 F.3d 546, 551 (6th Cir. 1999) ("[M]isconduct occurs when a jury could reasonably believe that the prosecutor was . . . expressing a personal opinion as to the witnesses credibility."). But, the majority of the prosecution's improper assertions of personal knowledge or opinion occurred during the summation and were directed at discrediting the psychiatrist proffered by Bates.

Dr. Griffin had testified as to Bates's troubled childhood, his history of antisocial behavior, his substance abuse problems, and diagnoses of his personality disorder and brain dysfunction. Dr. Willis Marshall testified on behalf of the state to counter Griffin's testimony. During the summation, the prosecutors repeatedly asserted their individual assessment of the mitigating evidence offered and in some instances their assessment of Bates's attorneys, Robert S. Peters and Roger J. Bean. For instance, General Shelton argued his beliefs regarding the appropriateness of considering the psychological evidence presented:

> "I don't care what Marshall says. I don't really care what Griffin says. I don't care at all what Mr. Peters or really, what Mr. Bean says because I believe this to be true, and I believe you share the same belief."

Apx. 1499. Referring to the testimony of Dr. Griffin as to the existence of mitigating circumstances, General Ramsey argued to the jury: "You don't believe that, and I don't believe it; and I don't even believe Mr. Bean and Mr. Peters believe that." Apx. 1507. He continues by pointing out his agreement with the State's proffered psychiatrist: "Dr. Marshall says it is a character flaw; I tend to agree with him." Again referring to Dr. Griffin's testimony, the prosecutor stated "You don't believe that, and I don't believe that." Apx. 1508. Even after the trial court had sustained an objection regarding the prosecutor's injection of personal opinion, the prosecutor continued along this line:

> Some of you might disagree with me, but it is hard for me to believe under this testimony–
>
> ***
>
> I get confused like everyone else; but it seems to me that what Dr. Griffin wants you to believe and what Mr. Bean and Mr. Peters would like for you to believe is that the reason Julia Guida was killed . . . .
>
> ***
>
> To me, it says more about the mental condition of Wayne Lee Bates than any psychiatrist who testified here.
>
> ***
>
> As I recall, Mr. Peters said in his argument that Wayne Lee Bates was abnormal. Well, I agree with that.

Apx. 1509, 1511-12, 1514, 1516. Other remarks in the summation, not put forth by Bates in his appeal, were likewise inappropriate assertions of the prosecutor's opinion.

> [Regarding Dr. Griffin's testimony]: I don't believe that. That is just not common sense. I don't give a darn how many articles that Dr. Griffin reads to develop his theory of what is right.

\*\*\*

> Do you think, as you look over the facts in this case, there is anything, ladies and gentlemen, that will ever inhibit him from killing again if he escapes?  I think not, and I believe that you share that feeling also.

Apx. 1497, 1510.  Again and again, the prosecutors explicitly expressed their personal opinions, denigrating the mitigating evidence presented by Bates's mother and Dr. Griffin.  To be certain, prosecutors can argue the record, highlight the inconsistencies or inadequacies of the defense, and forcefully assert reasonable inferences from the evidence.  But, they can not put forth their opinions as to credibility of a witness, guilt of a defendant, or appropriateness of capital punishment.  "[T]he prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *United States v. Young*, 470 U.S. 1, 18-19 (1985).

*3.    Improper Criticism of Defense Objections*.  During the sentencing hearing, the prosecutors also improperly criticized defense counsel's objections, suggesting the objections were meant to divert the jury's attention.  When the prosecution warns the jury of defense objections, it places the defense counsel in the no-win position of either passively permitting the prosecutors to make improper arguments or objecting and angering the jury.  In granting habeas relief to a petitioner on prosecutorial misconduct grounds, the Fifth Circuit  recognized the dilemma confronting defense counsel when prosecutors attack objections:

> Every defense objection, every motion for mistrial, was now an effort to conceal the truth, a slap at the jury.  In this circumstance improper or arguably improper argument presented the defense with a "heads I win, tails you lose" proposition.

*Houston v. Estelle*, 569 F.2d 372, 377-78 (5th Cir. 1978).  When the trial court is generally permissive of improper argument, as was the case here, the Hobson's choice is even more difficult.  In order to preserve the improper argument issue on appeal, counsel is forced to fruitlessly object at the risk of further alienating the jury.  On no less than six occasions, the prosecutors responded to defense objections with either personal attacks on opposing counsel or with suggestions that the objections were attempts to improperly divert the jury's attention.

First, General Shelton criticized Bates's counsel during the State's direct examination of Dr. Marshall, the psychiatrist called to rebut the testimony of Dr. Griffin.  Shelton had asked Marshall about "mental disorders."  In his answer, Marshall began to define the term as used "for the purposes of the court," prompting the following exchange:

> Mr. Bean:     May it please the court, I am going to object to his testifying as to what the standard with regard to the court is.  I think the Court will do that when you instruct the jury.
> The Court:    I didn't understand him to be testifying along that line–
> Mr. Shelton:  *I didn't either.  I think Mr. Bean is becoming paranoid.*

Apx. 1483.  While the court eventually directed Dr. Marshall to rephrase his answer, Shelton pounced on Bean's objection as frivolous and labeled him as "paranoid" in front of the jury.  It is plainly improper for a prosecutor to level a personal attack against opposing counsel. *United States v. Young*, 470 U.S. 1, 9 (1985) (noting an attorney "must not be permitted to make unfounded and inflammatory attacks on the opposing advocate "); *United States v. Carter*, 236 F.3d 777, 785 (6th Cir. 2001) ("[I]t is improper for counsel to make personal attacks on an opposing advocate.").

But the more troubling conduct occurred during summation when both Generals Shelton and Ramsey argued before the jury that Bates's lawyers were objecting as a diversionary tactic.  After

an improper argument objection was overruled by the court, Shelton addressed Bates's lawyer directly, "It's just getting too close for you." Apx. 1496. As he resumed his argument, he repeated, "[i]t is just getting too close." *Id.* Later in the closing argument, counsel for Bates again objected to the prosecution's improper argument. After that objection was overruled, Shelton addressed the jury: "You see, when it gets next to them, they stand up and object. Watch them." Following defense counsel's objection, the court directed the jury to disregard this improper comment and specifically instructed the prosecutor not to make further comments on objections. Yet, the prosecution continued, improperly responding to two subsequent objections. After an objection to the prosecutor's use of personal opinion, General Ramsey addressed Bates's counsel directly: "I don't think this jury is going to take my opinion. They are going to take the facts, Mr. Bean." Apx. 1508. Also after an objection, Ramsey tells the jury, "Of course, they are going to object. They don't want you to hear it again because–" Apx. 1514.

All of the remarks in question criticize defense counsel for protecting their client through objections. Such conduct, aimed at prejudicing the defendant's right to object, is clearly improper. If permitted, this type of intimidation tactic can operate to the detriment of a defendant's quality of representation, calling the fairness of the trial into question.

C.

Having determined that the prosecutor's conduct was improper, we must consider whether the misconduct was so flagrant as to warrant reversal. Flagrancy is determined by an examination of four factors: (1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant. *See Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004); *Bowling v. Parker*, 344 F.3d 487, 512-13 (6th Cir. 2003); *accord Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982) (en banc) (citing *United States v. Leon*, 534 F.2d 667, 677 (6th Cir. 1976)).

The Supreme Court of Tennessee found that "it was clearly improper for the State's counsel to make the comments which they did," that "the name-calling was inappropriate and certainly uncalled for," and that the prosecutors "might be well advised to adhere more rigidly to the disciplinary rules promulgated by the court for the conduct of counsel at trial." *Id.* Yet, the court determined that the misconduct did not taint the fairness of the hearing:

> [C]onsidering the nature of the crime involved and all the facts surrounding the homicide, we have concluded that the improper conduct in closing argument by the State's lawyers did not affect the verdict to the prejudice of defendant and did not warrant reversal of the conviction.

*Id.* at 881. Despite essentially conceding that the misconduct was egregious, the court found the misconduct was not prejudicial and did not affect the fairness of the proceeding. We cannot agree.

First, the remarks made by Shelton and Ramsey almost certainly prejudiced the defendant. The jury was told they would be accomplices to the crime unless they executed him. The prosecutors made it a theme of their summation that the jury's failure to sentence Bates to death would be akin to ordering the execution of Bates's next victim. Voting for a life sentence for this "rabid dog" was equivalent to putting a gun in his hand. This type of appeal to fear and emotion clearly poisoned the hearing. Likewise, the prosecution attempted to place the government's thumb on the scales by repeatedly interjecting personal opinion into the record. Attacks on defense counsel could have further prejudiced Bates by fostering jury antagonism towards his attorneys.

Second, the improper conduct was not isolated to one comment, one section of the argument or even to one prosecutor. In this case, both Shelton and Ramsey made numerous improper arguments. General Shelton attempted to discredit the defendant's mother through describing her testimony as a "performance" and made a personal attack on opposing counsel during the presentation of Bates's mitigation evidence. More importantly, both Shelton and Ramsey laced their entire closing argument with personal opinion, attacks on opposing counsel, and undignified and unprofessional appeals to hatred and fear. *See Jenkins v. Artuz* 294 F.3d 284, 294 (2d Cir. 2002) ("Standing alone, a prosecutor's comments upon summation can 'so infect [a] trial with unfairness as to make the resulting conviction a denial of due process.'") (internal citations omitted).

Third and most regrettably, the misconduct was plainly deliberate. We are not confronted with an off-hand remark in a heated trial. Instead, the prosecutors in this case opted to select inappropriate arguments and use them repeatedly during summation. Ramsey essentially acknowledged his use of "fear" and "emotion" during the closing. Even after the court sustained objections on behalf of Bates and admonished the prosecutors to refrain from criticizing opposing counsel and injecting personal opinion, the prosecutors continued their misconduct. The intentionality of the prosecutor's improper remarks can be inferred from their strategic use. The personal opinion of the prosecutors was primarily reserved for evaluating the testimony of the defense's one disinterested witness, Dr. Griffin. Bates's case for mitigation rested on Dr. Griffin and his mother, and the prosecutors repeatedly undermined Dr. Griffin's testimony by suggesting they did not believe it. They structured their closing argument around the idea that it was an inescapable fact that Bates would kill again–either a prison guard, or a fellow prisoner, or someone in society after his next escape. Their comparison of sentencing Bates to life imprisonment to giving him a gun was used as a refrain in the argument. They moreover attempted to intimidate opposing counsel into silence during this improper argument by using their objections against them.

Finally, we must address the total strength of the evidence against Bates. Importantly, in the death penalty context, we must distinguish between evidence of the defendant's guilt of the underlying criminal charge and evidence of any attendant aggravating and mitigating circumstances. Notably, the Tennessee Supreme Court ruled that the misconduct "did not warrant reversal of the conviction." But, the defendant's conviction for the underlying murder was a foregone conclusion in the sentencing hearing. There was no question as to his guilt for the crime. Instead, the inquiry was focused on the appropriate punishment. Overwhelming evidence of guilt can oftentimes be sufficient to sustain a conviction despite some prosecutorial misconduct, but overwhelming evidence of guilt does not immunize the sentencing phase evaluation of aggravating and mitigating factors. "[T]he Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). Prosecutorial misconduct in the sentencing hearing can operate to preclude the jury's proper consideration of mitigation. "When a prosecutor's actions are so egregious that they effectively 'foreclose the jury's consideration of . . . mitigating evidence,' the jury is unable to make a fair, individualized determination as required by the Eighth Amendment. *See DePew v. Anderson*, 311 F.3d 742, 748 (6th Cir. 2003) (quoting *Buchanan v. Angelone*, 522 U.S. 269, 277 (1998)).

If a habeas court is in "grave doubt" as to the harmlessness of an error, the habeas petitioner must prevail. *See O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). There can be little doubt that the improper argument clearly operated towards prejudicing Bates. It cannot be said to have been meaningless in the jury's consideration of mitigation. In this capital sentencing context, such flagrant misconduct by the prosecutor cannot be considered harmless error. The prosecutor's unnecessary

and intolerable conduct injected such vitriol into the proceedings, as to question the fairness of the entire sentencing hearing. Bates's death penalty cannot stand.[2]

### III. Remaining Issues

As we are ordering that Bates be resentenced on Fourteenth Amendment grounds, we do not reach the alternate grounds raised by the defendant in the challenge to his death sentence, including the improper admission of Bates's first confession, the improper jury instruction requiring unanimity for the consideration and weighing of mitigating evidence, the improper consideration of non-statutory aggravating factors, the failure of the trial court to grant a change of venue, ineffective assistance of trial counsel, and failure to seat an impartial jury.

Defendant also raises an issue that he claims warrants a granting of the writ and a new trial. He contends that his guilty plea should be set aside as it was not knowingly, intelligently, or voluntarily entered. *Boykin v. Alabama*, 395 U.S. 238 (1969). Specifically, Bates contends that his plea was involuntary because the trial court altered the terms of the written plea without the plaintiff's consent. The original written plea agreement signed by Bates preserved his right to appeal the trial court's admission of Bates's confessions. In open court, with Bates present and represented by counsel, the trial court noted that the written plea agreement might be interpreted as permitting Bates to challenge the admission of the confessions not only in appealing the sentencing phase, but also in appealing the guilt phase of the trial. During the proceeding, Bates's counsel added language to the written plea agreement indicating that Bates maintained the right to appeal the suppression issue "if [the confession was] introduced at the penalty phase of the trial and as it relates to the penalty phase of the trial." Bates did not re-sign the plea agreement, initial the changes, or affirmatively agree to this alteration in open court. After this language was added, the trial court accepted Bates's plea. Bates now claims that he intended to plead guilty only if he could preserve a challenge to the suppression issue as it related to the guilt phase of the trial, and that he did not voluntarily agree to the plea as modified by his counsel.

In state post-conviction proceedings, the Tennessee courts determined that the facts did not support Bates's assertion that his plea was involuntary. The trial court found that the attorneys representing Bates had extensive discussions with the defendant regarding the advisability of pleading guilty and the consequences of such a plea. *See Bates v. State*, 973 S.W.2d 615, 630 (Tenn. Ct. Crim. App. 1997). Additionally, the court found that Bates "upon informed advice of trial counsel accepted the formulation of a trial strategy of entry of a guilty plea without regard to the admissibility of previous confession or confessions;" that he "was advised of and concurred in the strategy that would attempt to reserve the right to appeal the admissibility of the confession or

---

[2]The District Court ruled that portions of Bates's prosecutorial misconduct claim were procedurally defaulted and thus insulated from habeas review. On habeas review, for the first time, Bates contends that the prosecutors improperly commented on his failure to testify and put victim impact evidence before the jury. He also raises, for the first time, several comments that were not addressed on direct appeal, asserting that the prosecutors engaged in misconduct when they argued that a death penalty was cheaper than a life sentence, that the jury should send a message to Bates that they would not be imprisoned by fear, that the jury had to execute Bates, and that they should "execute him like he executed Julie." The District Court's ruling could only stand if this misconduct was not "fairly presented" to the state court. *See Picard v. Connor*, 404 U.S. 270, 275-78 (1971). In analysis, this court would be required to determine whether these newly-raised instances of misconduct were so factually and legally dissimilar that the state courts were deprived of the opportunity to review the particular prosecutorial misconduct claims. We need not decide this issue, however, as the particular conduct that was explicitly raised and decided both on direct appeal and in the District Court is sufficiently egregious as to warrant reversal. This opinion is limited in scope to the misconduct that has been unquestionably preserved. The Tennessee Supreme Court evaluated Bates's prosecutorial misconduct claims on the merits, rather than relying upon a procedural bar. The prosecutorial misconduct claims, and the arguments underlying them are, therefore, properly before us. *See Boyle v. Million*, 201 F.3d 711, 716-17 (6th Cir. 2000). The District Court, like the Tennessee Supreme Court, substantively addressed the prosecutorial misconduct claims and the bulk of the prosecution arguments challenged as improper by Bates. Thus, there are no procedural obstacles to our review.

confessions notwithstanding a plea of guilty . . . if the confession or confessions were introduced during the sentencing phase of the trial;" and that he "was informed that upon entry of a guilty plea he would thereafter forever waive his right to appeal the issue of his guilt or innocence." *Id.* Nothing in the record undermines these factual findings that Bates understood the consequences of his guilty plea. Thus, we must conclude that Bates's plea was entered knowingly and voluntarily.

### *IV. Conclusion*

For the foregoing reasons, the judgment of the District Court is affirmed in part as to the soundness of Bates's guilty plea and conviction for the murder of Julie Guida, reversed in part as to the constitutionality of the sentencing trial, and remanded with instructions to conditionally grant the writ unless the State of Tennessee elects to initiate resentencing proceedings within 180 days of the district court's order.

---

**CONCURRENCE**

---

ALICE M. BATCHELDER, Circuit Judge, concurring. I concur in this opinion. I do not, however, concur in the opinion's holding, citing *DePew v. Anderson*, 311 F.3d 742, 748 (6th Cir. 2003), that prosecutorial misconduct during the penalty phase of the trial may violate the Eighth Amendment.

Because we analyze Bates's claims under the standards established by Congress in the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214 (1996), we may not grant a writ of habeas corpus with respect to any claim of legal error adjudicated on the merits in state court unless such state adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C.§ 2254(d)(1). As I observed in my dissent in *DePew*, neither *Buchanan v. Angelone*, 522 U.S. 269 (1998), cited by the lead opinion for this proposition, nor any other case out of the Supreme Court, holds that the Eighth Amendment mitigation requirement applies to the actions of prosecutors. Because we are bound to apply clearly established federal law as determined by the *Supreme Court*, the majority's reliance upon the Sixth Circuit's opinion in *DePew* is improper under AEDPA.

The issue, in my view is whether the misconduct of the prosecutor amounted to a denial of due process. Here, it clearly did. I therefore concur, and would grant a writ of habeas corpus based upon prosecutorial misconduct.