KAREN NELSON MOORE, Circuit Judge,
dissenting.
Because I believe that the prosecutorial misconduct during the guilt-phase of Billy Slagle’s trial so infected the trial that the misconduct violated Slagle’s due process rights, I respectfully dissent. I believe the Supreme Court of Ohio’s conclusion that Slagle received a fair trial despite the prosecutorial misconduct constituted an unreasonable application of clearly established Supreme Court precedent, specifically the legal principles in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), and Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).
I. THE PROSECUTOR REPEATEDLY MADE IMPROPER STATEMENTS
I share the majority’s view that the fifteen prosecutorial statements that it concludes were improper were in fact improper., The trial transcript is rich with evidence that the prosecutor consistently pushed the envelope throughout Slagle’s trial, and repeatedly overreached the bounds of proper prosecutorial conduct when questioning witnesses and presenting closing arguments. The improper prosecutorial comments included attacks on Slagle’s character and denigrations of Slagle’s attorneys and witnesses. In addition, the prosecutor made assertions of facts outside the trial record and vouched for prosecution witnesses. The pervasiveness of these improper prosecutorial statements — both in number and in subject matter — renders them worth repeating. I concur with the majority that it was improper for the prosecutor to:
(1) state during closing arguments that Slagle had the nerve to tell the jury that he prayed, Joint Appendix (“J.A.”) at 670 (Trial Tr. at 1810);
(2) insinuate that Slagle took the scissors from the scene so that he could use them in his next crime, J.A. at 656 (Trial Tr. at 1767);
(3) state that Slagle “and his kind ... represent some of the greatest threats against community and civilization as we know it,” J.A. at 702 (Trial Tr. at 1923);
(4) impugn Slagle’s counsel by suggesting that Slagle “was keyed in not to remember,” J.A. at 688 (Trial Tr. at 1841);
(5) impugn Slagle’s expert witness Dr. Bertschinger, who testified about the effects of intoxication, by characterizing Bertschinger’s testimony as “liberal quack theories ... of how you should excuse a person’s behavior,” J.A. at 700 (Trial Tr. at 1918);
(6) impugn Slagle’s lay witness Mike Davis by asserting that he was high when he testified, J.A. at 664 (Trial Tr. at 1798), and that he had “crawled out of a hole,” J.A. at 693 (Trial Tr. at 1906);
*530 (7) state that Slagle’s expert witnesses were “trying to promote a bit of sympathy for Slagle,” J.A. at 682 (Trial Tr. at 1833);
(8) assert “Policemen don’t scratch. Isn’t that a fact?” J.A. at 657 (Trial Tr. at 1768);
(9) state that the coroner had told the prosecution out of court that “the body doesn’t lie,” J.A. at 693 (Trial Tr. at 1906);
(10) insinuate that Slagle would have harmed the children sleeping upstairs at the time of the killing by stating that “[I]t’s a damn good thing the kids didn’t wake up. God forbid.” J.A. at 670 (Trial Tr. at 1810);
(11) again insinuate that Slagle would have harmed the children by stating “It is a good thing [Slagle] didn’t know that Howard [Bloxham] could identify him,” J.A. at 672 (Trial Tr. at 1813);
(12) vouch for the police work in this case during closing argument by stating, “I put my money on the homicide detectives,” J.A. at 692 (Trial Tr. at 1905);
(13) vouch for the police work by stating, “I do very much stand behind the police work,” J.A. at 701 (Trial Tr. at 1920);
(14) vouch for the police work by stating, “I put our trust in Patrolmen Chap-pelle and Finchum and Guido,” Id.;
(15) vouch for a prosecution witness by stating, “Howard Bloxham is not going to come in here and tell you something that is not true,” J.A. at 671 (Trial Tr. at 1812).
Beyond our agreement that all fifteen of these statements were clearly improper prosecutorial statements, my analysis of Slagle’s prosecutorial misconduct claim departs from the majority’s in several crucial ways, necessitating my dissent.
First, I believe several additional prose-cutorial statements were improper. To begin, I emphatically disagree with the majority that the prosecutor’s interrogation of whether Slagle engaged in prayer and liked prayer was proper. “A person’s beliefs, superstitions, or affiliation with a religious group is properly admissible where probative of an issue in a criminal prosecution.” United States v. Beasley, 72 F.3d 1518, 1527 (11th Cir.1996) (emphasis added). I struggle to comprehend how the majority can believe that these questions were probative to any issue in Slagle’s prosecution. The majority’s assertion that the prosecutor’s questions about Slagle’s relationship with prayer “concerned whether [the victim’s] statement concerning prayer was made” is simply not supported by the record, because these improper statements were made after those questions were asked and answered.
Based upon the previous testimony of the Bloxham children that Pope had prayed during Slagle’s attack and that in response, Slagle had told her to “shut up” and that he didn’t want to hear her prayers, J.A. at 414 (Trial Tr. at 1222), J.A. at 424 (Trial Tr. at 1239), it was not improper for the prosecutor to ask Slagle if those events occurred. The record clearly indicates, however, that the prosecutor persisted with this prayer-themed line of questioning after asking Slagle if the above statements were made, and after Slagle testified that he did not remember whether Pope prayed or what he said to her in response to her praying. J.A. at 642 (Trial Tr. at 1753). The prosecutor continued to question Slagle on this prayer theme, turning away from the events of Pope’s killing and generally questioning Slagle, who is a Native American, J.A. at 583 (Trial Tr. at 1692), about his habits and feelings regarding prayer. The prosecutor suggested, “You don’t like prayers, do you, Billy?” Slagle responded, “There *531 is nothing wrong with them.” The prosecutor responded with, ‘You don’t say them; right?”, to which Slagle responded in the affirmative. Slagle’s attorneys did not object, but the judge requested that Slagle clarify his answer and Slagle responded, “I say them[,]” and “I have always said them.” J.A. at 642^13 (Trial Tr. at 1753-54). Unwilling yet to abandon his prayer-themed questions, the prosecutor embarked on another line of questioning, asserting to Slagle “[y]ou sure weren’t saying [your prayers] when you were up to your neck ... in beer and marijuana” or when “you were drinking your beer on the afternoon” before he killed Pope. Id. at 643.
All of the prosecutor’s prayer-themed questions and religious references subsequent to Slagle’s statement that he did not remember Pope praying or his response to that were improper. The probative nature of this line of questioning stopped there. Slagle’s own religious beliefs and practices “had no bearing whatsoever on any legitimate issue in the case. Whether or not [these] statements] [were] prejudicial, [they] clearly invited the jury to consider religion as somehow relevant. Prosecuto-rial zeal cannot excuse such grave misconduct.” United States v. Goldman, 563 F.2d 501, 504-05 (1st Cir.1977). “Injection of religion into the case was flatly wrong and contrary to what the public has a right to expect of government prosecutors.” United States v. Cartagena-Carrasquillo, 70 F.3d 706, 713 (1st Cir.1995).
In addition to this improper religiously oriented interrogation of Slagle, it was also improper for the prosecutor to state during closing argument that Slagle lacked a conscience. In an apparent attempt to rebut Slagle’s theory that the alcohol and marijuana that he had ingested that day had diminished his culpability, the prosecutor asserted, “Billy Slagle didn’t need a conscience eliminator. You can’t eliminate what is not there. He has no conscience.” J.A. at 685 (Trial Tr. at 1836).
Similarly, during Slagle’s cross examination, the prosecutor repeatedly used the phrase “the lie of your life,” J.A. at 644-45, 652 (Trial Tr. at 1755-56, 1763). The third time the prosecutor used that phrase, Sla-gle asked what he meant by it, and the prosecutor responded with “Your life has been one big lie, right?” J.A. at 652 (Trial Tr. at 1763). Slagle’s counsel did not object.
The prosecutor’s statements that Slagle “has no conscience” and that his whole “life has been one big lie” were highly improper. The statements were not specific questions or references to any inconsistencies in Slagle’s testimony, but rather they were blanket assertions that Slagle was a terrible person who could not be trusted. These character assaults on Sla-gle were improper because they represented the prosecutor’s personal beliefs, which may not be introduced into the trial. See United States v. Young, 470 U.S. at 8-9, 105 S.Ct. 1038 (“Defense counsel, like the prosecutor, must refrain from interjecting personal beliefs into the presentation of his case.”). Given that Slagle decided to testify, “it was not improper for the prosecutor to question his credibility. The impropriety stems from the manner in which [he] did so. The prosecutor’s attacks were not expressly based on evidence before the jury.” United States v. Francis, 170 F.3d 546, 552 (6th Cir.1999). “These utterances of personal sentiment placed in front of the jury with no explanation or indication of evidentiary bases were improper.” Id.
II. THE PROSECUTOR’S IMPROPER COMMENTS WERE FLAGRANT
I am bewildered and dismayed by the majority’s conclusion that Slagle received a *532 fair trial despite these widespread and diverse prosecutorial attacks on him and his defense, as well as the improper vouching for the state’s witnesses. The majority’s claim that “almost all” of the improper comments were “minimally prejudicial” is incredible. (Majority Op. at 18). After considering the four factors relevant to determining flagrancy — whether the improper comments “tended to mislead the jury or prejudice the defendant,” whether the improper comments “were isolated or extensive,” “whether the remarks were deliberately or accidentally made,” and the strength of the evidence of Slagle’s guilt— I am persuaded that these improper statements were flagrant, and did not constitute harmless error. Bates v. Bell, 402 F.3d 635, 641 (6th Cir.), cert. denied, — U.S. -, 126 S.Ct. 163, 163 L.Ed.2d 150 (2005). Instead, I believe that the prosecutor’s repeated attacks on Slagle and his defense case, as well as the improper bolstering of the state’s case, “so infected the trial with unfairness as to make the resulting conviction a denial of due process.” Donnelly v. DeChristoforo, 416 U.S. at 643, 94 S.Ct. 1868.
Many of the prosecutor’s improper assaults and references were likely to mislead the jury or prejudice the defendant. The vouching statements and assertions of facts outside the record present at least two dangers: (1) “the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant’s right to be tried solely on the basis of the evidence presented to the jury”; and (2) “the prosecutor’s opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government’s judgment rather than its own view of the evidence.” Young, 470 U.S. at 18-19, 105 S.Ct. 1038. “[IJmproper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.” Berger, 295 U.S. at 88, 55 S.Ct. 629.
While the prosecutor’s vouching and bolstering comments were prejudicial, the most vile of the prosecutor’s statements were the attacks on Slagle’s religious practices made during Slagle’s cross examination and the state’s closing argument. That the prosecutor utilized a religiously oriented narrative throughout Slagle’s trial increased the prejudicial nature of these attacks on Slagle’s religious beliefs. A review of the record reveals a prosecutorial theme whereby the prosecutor repeatedly described Mari Anne Pope as a devout Christian, and portrayed Billy Slagle as a nonbeliever or a believer of dubious faith.[1] The prosecutor returned to this theme in *533 his closing argument, chiding Slagle for stating on cross examination that he prayed.
Whether either of these narratives about the religious beliefs and habits of Pope and Slagle is factually correct is utterly irrelevant to the central issue at the heart of Slagle’s trial — whether Slagle’s voluntary intoxication from alcohol and marijuana prevented Slagle from having the requisite intent for aggravated murder when he killed Mari Anne Pope. Despite the irrelevance of the victim’s and Slagle’s religious practices to this ultimate issue at trial, the prosecutor persistently pursued this theme in his attempt to portray Slagle as nonreligious and hostile to religion. While not probative to any material issues, these religiously oriented statements were highly prejudicial. These religiously oriented attacks on Slagle were brazen appeals to the jury’s religious predilections or biases and likely to inflame the jury. See United States v. Grey, 422 F.2d 1043, 1046 (6th Cir.1970) (stating that appeals to prejudices are “foul blows” not tolerated by the United States courts and applying Berger); United States v. Heller, 785 F.2d 1524, 1527 (11th Cir.1986) (stating that appeal to a jury’s racial and religious prejudices “prevents the impartial decision-making that both the Sixth Amendment and fundamental fair play require.”); Bains v. Cambra, 204 F.3d 964, 974 n. 5 (9th Cir.2000) (stating that, “although perhaps to a lesser extent” than racial or ethnic-based arguments, “religion-based prosecutorial arguments also are prohibited under clearly established federal law”); United States v. Cabrera, 222 F.3d 590, 594 (9th Cir.2000) (“Appeals to racial, ethnic, or religious prejudice during the course of a trial violate a defendant’s Fifth Amendment right to a fair trial.”).
The improper prosecutorial statements in Slagle’s trial were also extensive, in terms of the number of improper statements as well as in the breadth of improper references. “[T]he improper conduct was not isolated to one comment,” or “one section of the argument.” Bates, 402 F.3d at 648. The prosecutor improperly attacked Slagle and his intoxication defense from every possible angle. The nature of the improper statements and the transparency of the prosecutor’s strategies evidence that the statements were made deliberately. Id. (stating that the “intentionality of the prosecutor’s improper remarks can be inferred from their strategic use”). These statements were not “off-hand remark[s] in a heated trial,” but rather the prosecution “opted to select inappropriate arguments and use them repeatedly,” both when questioning witnesses and during closing arguments. Id.
Finally, I do not share the majority’s belief that there was overwhelming evidence that Slagle was sober enough when he killed Pope that he possessed the necessary intent to commit aggravated murder. From my review of the record, I believe that this was a much closer question than the majority presents. The defense presented undisputed testimony that “Slagle had at least 12 and probably more beers, that he had 4 or 5 shots of bourbon, and that he was smoking marijuana in the 12 hour period that immediately preceded the crime.” J.A. at 589 (Trial Tr. at 1698). The detectives who arrived at the crime scene shortly after the killing described Slagle as having glassy eyes. J.A. at 474 (Trial Tr. at 1428). Slagle presented credible expert testimony that, even accounting for his history of teenage alcoholism, Sla-gle’s level of intoxication at the time of the crime was likely to have impaired his judgment and his ability to reason, undermining the prosecution argument that he had the specific intent to kill that an aggravated murder conviction requires. See J.A. at *534 589-90 (Trial Tr. at 1698-99); J.A. at 611-12 (Trial Tr. at 1720-21) (expert testimony-stating that “the highest functions of the brain,” including “the ability to observe, the ability to make judgments, the ability to have insight into situations” are the first functions to be lost when intoxicated).
Furthermore, even in circumstances where the case against a defendant “was relatively straightforward and strong,” we have granted habeas relief to a defendant alleging prosecutorial misconduct where the “egregious and inflammatory nature of the behavior and arguments of the prosecutor throughout trial” leaves us “with ‘grave doubt’ as to whether the prosecuto-rial errors ‘had substantial and injurious effect or influence in determining the jury’s verdict.’ ” Boyle v. Million, 201 F.3d 711, 717, 718 (6th Cir.2000) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)). In pursuing Slagle’s conviction, the prosecutor’s behavior was so egregious and inflammatory that I have grave doubts about the integrity and fairness of Slagle’s trial and resulting conviction.
III. THE PROSECUTORIAL MISCONDUCT DEPRIVED SLA-GLE OF A FAIR TRIAL
A prosecutor “may prosecute with earnestness and vigor — indeed, [the prosecutor] should do so.” Berger, 295 U.S. at 88, 55 S.Ct. 629. A prosecutor “may strike hard blows,” but “is not at liberty to strike foul ones. It is as much [the prosecutor’s] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.” Id. The need for a prosecutor to respect the boundary between hard and foul blows is perhaps never more important than when the prosecutor is seeking a capital conviction. See Ohio Adult Parole Auth. v. Woodard, 523 U.S. 272, 281, 118 S.Ct. 1244, 140 L.Ed.2d 387 (1998) (plurality opinion) (stating that to the extent that defendant’s life interest would require greater procedural protections in capital versus noncapital cases, such distinctions “are primarily relevant to trial”). Slagle’s prosecutor struck a multitude of foul blows, against Slagle as a person and a defendant, engaging in a panoply of improper tactics to obtain his capital conviction. These blows “so infeci> ed the trial with unfairness as to make the resulting conviction a denial of due process.” Donnelly v. DeChristoforo, 416 U.S. at 643, 94 S.Ct. 1868. I would reverse the district court’s judgment denying Slagle habeas relief on his prosecutorial misconduct claim. I respectfully dissent.

. See J.A. at 349 (Trial Tr. at 1040) (stating during opening statements that Pope "was a deeply religious woman”); J.A. at 377 (Trial Tr. at 1151) (questioning Pope's cousin in detail about Pope's rosary); J.A. 386-87 (Trial Tr. at 1160-61) (eliciting testimony from Pope's cousin about witnessing Pope wearing her scapular); J.A. at 403 (Trial Tr. at 1190) (eliciting testimony about "the broken rosary, the tom chain, the torn scapular” at the crime scene); J.A. at 641 (Trial Tr. at 1752) (accusing Slagle of tearing up Pope's rosary and throwing it on the floor, asking Slagle if he knows what a rosary is, and asking Slagle if he is a Catholic); J.A. at 642 (Trial Tr. at 1753) (accusing Slagle for a second time of destroying Pope's rosary during the assault, asserting that Slagle doesn't like and doesn’t say prayers); J.A. at 670 (Trial Tr. at 1810) (stating during closing arguments that Pope "was a very religious woman,” that Pope "was ready to meet God, and Billy was going to send her to meet him”); Id. (stating that Slagle "had the nerve to tell you, 'I pray, I pray.' ”); J.A. at 673 (Trial Tr. at 1814) (stating that Pope "is praying, and she is praying for her life”); J.A. at 702 (Trial Tr. at 1923) (referring to prayer as one of Pope’s last acts "to do on this earth”).