RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 10a0281p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

DONALD RAY MIDDLEBROOKS,
             *Petitioner-Appellant,*

      *v.*

RICKY BELL, Warden,
             *Respondent-Appellee.*

No. 05-5904

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 03-00814—Robert L. Echols, District Judge.

Argued: April 29, 2010

Decided and Filed: September 1, 2010

Before: MOORE, CLAY, and GILMAN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Paul R. Bottei, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. James E. Gaylord, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. **ON BRIEF:** Paul R. Bottei, Gretchen L. Swift, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. James E. Gaylord, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.

───────────────

## OPINION

───────────────

KAREN NELSON MOORE, Circuit Judge. In 1989, a jury convicted Donald Middlebrooks of the 1987 kidnaping and murder of Kerrick Majors, a fourteen-year-old African-American youth, and sentenced Middlebrooks to death. The Tennessee Supreme Court affirmed the convictions but vacated the death sentence in 1992. In

1

1995, a jury again sentenced Middlebrooks to death after finding that the murder was especially heinous, atrocious, or cruel and after weighing the aggravating and mitigating circumstances. Middlebrooks raised a number of constitutional claims in state postconviction proceedings and in a subsequent habeas petition in federal district court. The district court denied relief on all claims and denied a certificate of applicability ("COA").

This court granted a COA with respect to seven issues in three categories: (1) ineffective assistance of counsel due to (a) failure to investigate and present mitigating evidence of brain damage, (b) failure to investigate and present mitigating evidence of physical and sexual abuse, (c) failure to prepare adequately for the testimony of a mental-health expert witness, and (d) failure to investigate and present mitigating evidence of the relative dominance of a co-defendant; (2) violation of the Confrontation Clause based on the trial court's refusal to grant Middlebrooks's counsel access to a prosecution witness's hospital records; and (3) prosecutorial misconduct based on the statements during closing argument that (a) the victim's family wanted the jury to return a verdict of death, and (b) the Bible teaches that the death penalty is the appropriate punishment for murder. After careful review, we now **AFFIRM** the district court's judgment denying Middlebrooks's habeas petition.

## I. BACKGROUND

In 1989, a jury heard evidence of Middlebrooks's involvement in Majors's murder during the guilt phase of Middlebrooks's capital trial, summarized as follows by the Tennessee Supreme Court:

> [O]n the evening of Sunday, April 26, 1987, around 7:00 p.m., the victim, Kerrick Majors, a 14-year-old black male, was with four friends on Gallatin Road in East Nashville, Tennessee, when they saw a table with a "lot of stuff" being set up across the street as a flea market by three homeless street persons: the defendant, Donald Middlebrooks (a 24-year-old white male); his wife, 17-year-old Tammy Middlebrooks; and their companion, 16-year-old Roger Brewington. The five boys ran across Gallatin Road and were looking at the flea market when Tammy Middlebrooks called out, "Hey, leave our stuff alone!" The boys started

running. The defendant and Brewington chased them until they caught Majors. Brewington grabbed Majors in a "sleeper hold" around his neck and head. The defendant held his hand. When Majors said, "Hey man, you know me," Brewington responded, "Shut up, you nigger." Shannon Stewart and another of the boys, Tony Watson, saw the two men drag Majors toward the table and observed the defendant strike him in the face, knocking him to the ground. Frightened, the boys took off running. Later that evening, they reported these events to the victim's mother, who called the police.

The next afternoon, Kerrick Majors' nude body was discovered lying face up in a dry creek bed under a foam mattress in a heavily wooded area behind a drugstore on Gallatin Road in the area where the defendant and Brewington had caught Majors. A bloodstained T-shirt was tied around his neck. A red rope belt was tied around Majors' left wrist, and there was a two-inch laceration in his right wrist. Abrasions, swelling, and bruising were present on the victim's head, his left eye, his nose, his lips, and inside his mouth. An "X" with a vertical line running through it had been cut into his chest. The forensic pathologist, Dr. Charles Harlan, testified that these incisions had been made while Majors was alive. There were two deep stab wounds in the center of the body. One of these penetrated the left lung and pulmonary artery and caused the victim to bleed to death over a period of ten to thirty minutes, during part of which Majors was conscious. Investigating officers noticed a smell of urine about the face, and there were bruises and skinned areas on the back. A wooden stick with blood stains on one end was found lying close to the victim's head.

Around 1:10 a.m. on April 28, police investigators met Brewington at a doughnut shop several miles from the Gallatin Road area. Brewington directed the officers to the location of a knife with a brass knuckle handle, which was bloodstained. Dr. Harlan testified that this knife could have inflicted the deep stab wounds on the victim's body. Brewington also directed the police to a wooded area between Gallatin Road and Ellington Parkway in Nashville where, around 7:00 a.m. on April 28, Donald and Tammy Middlebrooks were apprehended at a small plywood shack. The defendant, who resisted the arresting officers, had a knife with him. He was arrested with the aid of police dogs, taken to the hospital for treatment of the dog bites, and later transported to police headquarters.

At 12:30 p.m. that day, the defendant gave a lengthy video-taped statement about his involvement in the death of Kerrick Majors. The defendant admitted participating in the beating and mistreatment of Majors, but described his role as minor and depicted Roger Brewington as the primary perpetrator of the offense. After Majors was caught,

Middlebrooks said Brewington suggested they "have some fun," and the three of them took Majors back into the woods. His hands were tied. Brewington slapped him, beat him with the knife's brass knuckles, hit him with a stick, and urinated into his mouth. The defendant admitted striking Majors with his open hand and on the leg with a switch. Defendant said that his wife Tammy had slapped Majors and burned Majors' nose with a cigarette lighter as Brewington urged her on. Brewington hit Majors on his testicles, threatened to cut "it" open, stuck a stick up Majors' anus, hit him some more with the brass knuckles, wiped the victim's blood on himself, beat his mouth and tongue with a stick, dropped the knife on him, gagged him, and slashed his wrist. Finally, when the defendant asked Brewington to stop because the victim's crying and pleading were getting on his nerves, Brewington gave the victim "the kiss of death" on the forehead. Brewington then gave the defendant the knife and told him to stab Majors. When the defendant refused, Brewington stabbed Majors. The defendant then reluctantly stabbed the victim, according to him, "to prove to Roger that I guess I was cooler" and to put Majors out of his misery. In a previous statement, however, the defendant had said that he had stabbed Majors twice. The victim's ordeal began at 7:30 p.m. and ended at 11:00 p.m. that night with the stabbing.

The next day, the defendant said he and Brewington went back to where they had left the body. Brewington kicked it and made the "X" lacerations at this time. The defendant said he then covered Majors with a foam mattress. The defendant admitted that before beating and killing Majors, he and Brewington had drunk alcohol and smoked marijuana.

The defendant presented no proof.

*State v. Middlebrooks*, 840 S.W.2d 317, 323–25 (Tenn. 1992). On the basis of this evidence, the jury convicted Middlebrooks of felony murder and aggravated kidnaping but acquitted him of first-degree premeditated murder, armed robbery, and aggravated sexual battery. During the penalty phase of his trial, the jury found two aggravating circumstances—that the murder was especially heinous, atrocious, and cruel in that it involved torture or depravity of mind, and that it was committed while Middlebrooks perpetrated a felony—and that those aggravating circumstances outweighed the mitigating factors. The jury therefore sentenced Middlebrooks to death.

On direct appeal, the Tennessee Supreme Court affirmed Middlebrooks's convictions but vacated his death sentence because the second aggravating circumstance

"essentially duplicates the elements of the offense of first-degree felony murder" and therefore "does not sufficiently narrow the population of death-eligible felony murder defendants under the Eighth Amendment to the U.S. Constitution, and Article I, § 16 of the Tennessee Constitution." *Id.* at 323.

At the second sentencing proceeding, held in October 1995, the State introduced evidence supporting the above-described events and the following details:

> According to the State's proof, fourteen-year-old Majors was small for his age.[FN5]   He was described as a good student who loved school.  He was not a violent person, nor did he carry a weapon.  Since his murder, his mother's health has deteriorated.  She has been on medication and will not leave the house except for doctor appointments. She has had a nervous breakdown, suffers from panic attacks, and has not been able to sleep at night since the murder.  Majors' older brother blames himself for Majors' death and now suffers from mood swings.
>
> > [FN5] The autopsy indicated that Kerrick Majors was 4' 11" tall and weighed 112 pounds.
>
> Shannon Stewart testified that he had spoken with Middlebrooks the morning of the murder.  Middlebrooks had told Stewart that he was a member of the KKK, that he "hated niggers," and that he punched a black man just for saying hello.  Stewart also testified that he overheard Middlebrooks order Majors to "shut up nigger."

*State v. Middlebrooks*, 995 S.W.2d 550, 554–55 (Tenn. 1999).   In mitigation, Middlebrooks's attorneys put forth the following evidence:

> Middlebrooks' cousins, James and Carol Sue Little, and his half-sister, Sharon Fuchs, testified about Middlebrooks' childhood.  Middlebrooks grew up in Texas.  His father died when he was four.  His mother remarried and had another child, Ms. Fuchs, before she again divorced. Middlebrooks' mother either left the children at night with relatives or else would take them to bars with her.
>
> According to the proof, Middlebrooks' mother would often bring men to the house, and the children sometimes heard or saw their mother having sex.  Ms. Fuchs testified that sometimes these men would molest her while her mother watched.   She further testified that she, Middlebrooks, and other children in the family were molested by different family members.  For example, Middlebrooks was often left alone with a male relative who had sexually abused him, and

Middlebrooks' mother would grab him between his legs and also watch him use the bathroom. According to Sharon Fuchs, the small town in which they grew up lacked counseling services or social service agencies where they could seek help for sexual abuse. According to her, no one in the family ever discussed or admitted the family's problems.

The proof further indicated that Middlebrooks was often angry and got into trouble. He was sent to a Methodist Home for Children in Waco for two years. Later, he was twice sent to prison. Between prison stays, Middlebrooks started to have seizures. On one occasion he climbed a water tower and threatened to commit suicide. He was hospitalized more than once at a mental institution.

A psychologist, Dr. Jeffrey L. Smalldon, performed neuropsychological and psychological evaluations of Middlebrooks. From these evaluations, interviews, testing, and prior education and medical records, Smalldon concluded that Middlebrooks has a severe borderline personality disorder. Middlebrooks exhibited several characteristics of the disorder including inconsistent behavior, instability of mood, a marked identity disturbance, impulsive and reckless behavior, poor anger control, and recurring suicidal or self-destructive acts. Smalldon testified that the documents from other mental health professionals who have evaluated Middlebrooks indicate that he suffers from substance abuse, psychotic personality disorder, and schizophrenia. Middlebrooks also suffers a mild degree of organic brain impairment which causes him to be more impulsive and less able to delay his responses. Finally, Smalldon testified that Middlebrooks has also exhibited characteristics of adults who were sexually abused as children.

During cross-examination, Dr. Smalldon admitted that Middlebrooks confessed to a greater involvement in Majors' death than he had in the video-taped confession. For instance, Smalldon disclosed that Middlebrooks admitted to him that it was his idea to hold Majors for ransom, that he helped tie Majors up, and that he urinated on Majors. In an attempt to resolve the discrepancies between the video-taped confession to the police and the confession made to him in the interview, Smalldon explained that Middlebrooks is a chronic liar. Dr. Smalldon conceded that Middlebrooks had never expressed any remorse to him. Smalldon agreed that there were some indications in the medical records of Middlebrooks' malingering, but testified that these indications were not inconsistent with mental illness.

In rebuttal, the State introduced the testimony of two experts indicating that Middlebrooks was exaggerating his mental illness symptoms, that he was competent to stand trial, that he did not have a defense of insanity, and that he was not committable. One expert

> testified that he could not say whether Middlebrooks was mentally ill. The other expert testified that he made no finding of mental illness and did not consider a personality disorder to be a mental illness.

*Id.* at 555–56.  The jury found beyond a reasonable doubt the statutory aggravating circumstance that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind.  Concluding that this aggravating circumstance outweighed Middlebrooks's mitigating factors, the jury reimposed a sentence of death. The Tennessee Court of Criminal Appeals and Tennessee Supreme Court affirmed the sentence on direct appeal.  *State v. Middlebrooks*, No. 01C01-9606-CR-00230, 1998 WL 13819 (Tenn. Crim. App. Jan. 15, 1998) (unpublished opinion); *Middlebrooks*, 995 S.W.2d 550.

In November 1999, Middlebrooks filed a petition for postconviction relief in state court, raising, inter alia, ineffective assistance of counsel based on trial counsel's alleged inadequate performance during the resentencing proceeding.  In May 2001, while the petition was pending, the state trial court denied Middlebrooks's ex parte motion for funds to conduct brain scans on Middlebrooks.  After an evidentiary hearing at which Middlebrooks's resentencing attorneys testified, the trial court dismissed the petition in July 2001.  The Tennessee Court of Criminal Appeals affirmed.  *Middlebrooks v. State*, No. M2001-01865, 2003 WL 61244 (Tenn. Crim. App. Jan. 9, 2003) (unpublished opinion).

Middlebrooks filed a petition for writ of habeas corpus in federal district court in September 2003, amending it in 2004.  The district court denied all sixteen claims (with their multiple subclaims) raised therein, concluding that some were procedurally defaulted and rejecting others on the merits.  *Middlebrooks v. Bell*, No. 3:03-0814 (M.D. Tenn. May 26, 2005) (unpublished opinion).  The district court denied a COA and then, on remand from this court, issued a more particularized denial.  *Middlebrooks v. Bell*, No. 03-0814, 2007 WL 760441 (M.D. Tenn. Mar. 8, 2007).  We then granted a COA on the seven issues discussed below.

## II. ANALYSIS

### A. Standard of Review

This court reviews de novo a district court's denial of a petition for writ of habeas corpus. *White v. Mitchell*, 431 F.3d 517, 524 (6th Cir. 2005). Because Middlebrooks filed his habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), that statute's deference provisions apply. *Joseph v. Coyle*, 469 F.3d 441, 449 (6th Cir. 2006). Under AEDPA, when a state court addresses the merits of a claim, a federal court can grant the writ only if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or was "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d). When a state court does not address the merits of a claim, federal review is de novo. *Maples v. Stegall*, 340 F.3d 433, 436–37 (6th Cir. 2003).

Federal review is barred altogether by the doctrine of procedural default when "a petitioner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule." *Mitchell v. Mason*, 325 F.3d 732, 738 (6th Cir. 2003). This doctrine applies only if the requirements laid out in *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), are met: first, the procedural rule applied to the petitioner and he failed to follow it; second, the state court actually denied his claim based on the state procedural rule; and third, the rule constituted an adequate and independent state ground to deny relief, meaning that the rule was firmly established and regularly followed in the state courts. *Id.* at 138; *Mitchell*, 325 F.3d at 738. If these requirements are met, a petitioner can still overcome procedural default "by either demonstrating cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrating that failure to consider the claims will result in a fundamental miscarriage of justice." *Murphy v. Ohio*, 551 F.3d 485, 502 (6th Cir. 2009) (internal quotation marks and brackets omitted).

**B. Ineffective Assistance of Counsel**

Middlebrooks claims that trial counsel rendered constitutionally ineffective assistance in violation of his Sixth Amendment rights during his second sentencing proceeding. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The Supreme Court has separated this inquiry into two parts: whether counsel's performance was deficient and whether the deficiency prejudiced the petitioner's defense. *Id.* at 687. Attorney performance is deficient if it is unreasonable under the prevailing professional norms. *Id.* at 688. A strategic decision will not be the basis of a finding of deficient performance so long as that strategic decision was reasonable. *Id.* at 689; *English v. Romanowski*, 602 F.3d 714, 726 (6th Cir. 2010). A defendant can establish prejudice by showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Middlebrooks's ineffective-assistance claim focuses on four alleged shortcomings: (1) failure to present evidence of brain damage, (2) failure to present evidence of physical and sexual abuse suffered as a child, (3) failure adequately to prepare Dr. Smalldon for cross-examination, and (4) failure to present evidence of Brewington's relative dominance in Majors's murder. We address each in turn.

### 1. Failure to Investigate and Present Evidence of Brain Damage

In Claim 9(a) of his habeas petition, Middlebrooks claims that his attorneys failed to investigate and present evidence of Middlebrooks's brain damage and related seizure disorder and mental illness that would have enhanced his mitigation case. The core of his argument is that counsel should have arranged for an MRI or PET scan of Middlebrooks's brain. In support of his claim, Middlebrooks presents an MRI and a PET scan paid for by his habeas attorneys and affidavits from several neuroscientists

stating that those scans reveal abnormalities in the areas of Middlebrooks's brain responsible for emotions, behavior control, and social judgment.

As a threshold matter, the State argues that this claim is procedurally defaulted. Contrary to the district court's opinion, Middlebrooks did present this claim to the state courts, pleading in his petition for postconviction relief counsel's "failure to move for expert assistance of a neurologist who could have conducted necessary testing and provided expert testimony regarding the issue of brain damage and its effect upon Petitioner." J.A. at 1165. Problematically, however, Middlebrooks failed to offer any authority in support of this claim on postconviction appeal, in contravention of state-court procedural rules. We consider the *Maupin* factors to determine whether those state-court rules now bar our review.

Tennessee Court of Criminal Appeals Rule 10(b) provides that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Rule 27(a)(7) of the Tennessee Rules of Appellate Procedure provides that an appellant's brief must contain "[a]n argument . . . including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record," and Rule 27(g) requires attorneys to cite specific pages when citing the record. Middlebrooks failed to comply with these court rules when he merely listed his ineffective-assistance-of-counsel claim among several others in an addendum to his appellate brief in an effort "to preserve these issues as much as is possible." J.A. at 1284–85. The state appeals court actually enforced the procedural rules when it held that all claims listed in the addendum "are waived" because Middlebrooks "failed to reference the record, cite any authority, or present any argument regarding these issues." *See Middlebrooks*, 2003 WL 61244, at *12 (citing Tenn. Ct. Crim. App. R. 10(b) and Tenn. R. App. P. 27(a)(7), (g)). Finally, a review of Tennessee cases indicates that these appellate court rules are firmly established, and Middlebrooks does not argue otherwise. *See State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003); *State v. Thompson*, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000); *State v. Schaller*, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997); *see also Lewis*

*v. Tennessee*, 279 F. App'x 323, 326 (6th Cir. 2008) (unpublished opinion) (finding procedural default based on state court's application of Tenn. Ct. Crim. App. R. 10(b) and Tenn. R. App. P. 27(a)); *Killebrew v. Bernhardt*, No. 94-6567, 1995 WL 712761, at *1 (6th Cir. Dec. 1, 1995) (unpublished opinion) (same).

Accordingly, Claim 9(a) is procedurally defaulted unless Middlebrooks can demonstrate cause and prejudice or that a miscarriage of justice will result. Middlebrooks relies on the former exception, offering as cause the state postconviction court's denial of his request for funding to hire a neuroscientist who could perform MRI and PET scans. As the State points out, in support of his argument Middlebrooks cites only cases holding that 28 U.S.C. § 2254(e)(2) does not prevent the district court from holding an evidentiary hearing when the petitioner's failure to develop the record in state court resulted from the state courts' denial of funds. These cases can help Middlebrooks put his new evidence before a federal habeas court, but they do not help him establish cause for procedural default. Notwithstanding the citation of inapposite cases, however, Middlebrooks's argument is properly directed at procedural default. He argues in his reply brief that he "failed to present evidence relating to brain damage . . . because he was denied funding" to develop that evidence. Reply Br. at 10. In essence, he argues that he failed to brief the claim on postconviction appeal because he had no new evidence to support it, and he had no new evidence because the trial court denied him funding. The new evidence of brain damage came to light only when Middlebrooks's habeas attorneys drew on their own funds to conduct MRI and PET scans.

Though Middlebrooks's argument is not without force, we ultimately cannot conclude that the trial court's denial of funds excuses Middlebrooks's failure to comply with the Tennessee court's briefing rules in presenting his ineffective-assistance-of-counsel claim on postconviction appeal. Middlebrooks could have argued deficient performance by providing evidence that it was standard practice among capital defense attorneys in the mid-1990s in Tennessee to obtain an MRI or PET scan when there are indications of brain damage. Alternatively, he could have argued, as he does now, that Dr. Smalldon's observations should have led counsel to seek a brain scan. Regarding

prejudice, we acknowledge that Middlebrooks would have had more difficulty without the scans than with them in convincing the state court that the jury might have sentenced him to life. Nonetheless, Middlebrooks at least could have argued that a brain scan confirming Dr. Smalldon's suspicion of organic brain damage would have made a stronger impression on the jury. Thus, although the trial court's denial of funds certainly explains why Middlebrooks could not make his argument as forcefully as he could have with the brain scans, it does not explain his failure to make any argument at all. Accordingly, Middlebrooks has not demonstrated cause, and his claim for ineffective assistance of counsel by failure to investigate and present further evidence of brain damage is procedurally defaulted.

### 2. Failure to Investigate and Present Evidence of Physical and Sexual Abuse

In Claim 9(b) of his habeas petition, Middlebrooks argues that his trial counsel were constitutionally ineffective in failing to uncover and present evidence of the traumatic physical and sexual abuse that he endured as a child. Specifically, Middlebrooks states that the jury never learned that he "was forced into child prostitution by his mother to make money for alcohol and drugs and was himself introduced to alcohol and drugs (including marijuana and heroin) by his mother at a very young age," or that he "was repeatedly raped, beaten, and subjected to sexual torture by family friends, relatives, his own mother, his mother's boyfriends, and his mother's customers—all with his mother's knowledge and permission." Pet'r Br. at 53–54. Furthermore, he alleges that the jury never learned that these traumatic childhood experiences resulted in PTSD, which, according to one expert, "impaired Mr. Middlebrooks from effectively conforming his behavior to the law at the time of the offense for which he has been sentenced to death." J.A. at 1545.

In fact, the jury heard much of this evidence from Middlebrooks's half-sister Sharon Fuchs and from Dr. Smalldon. They testified that Middlebrooks's mother sometimes took the kids to bars with her and sometimes left them there; that she brought men home for sex; that the children at times heard and saw her having sex; and that Fuchs was at times made to participate in the sex. Fuchs and Dr. Smalldon also testified

that an uncle named W.T. Edwards molested Fuchs and Middlebrooks; that Fuchs witnessed a pedophile cousin named John Eugene Little anally rape Middlebrooks when Middlebrooks was thirteen or fourteen years old; that Little raped Middlebrooks multiple times; that Middlebrooks's mother knew about Little's conduct but nonetheless had him babysit the children; that she herself used to grab Middlebrooks between the legs and watch him go to the bathroom; and that she forced Middlebrooks to perform sex acts on her on a frequent basis for two to three years. After reviewing these events, Dr. Smalldon discussed common long-term effects of childhood sexual abuse, including emotional numbing, tendency to devalue oneself and others, and repressed anger. Dr. Smalldon explained that he observed many of these effects in Middlebrooks and that he believed Middlebrooks suffered from severe borderline personality disorder.

To be sure, Middlebrooks now highlights details that his trial counsel did not bring out. Middlebrooks presents evidence that he was raped by Little at age eight, that Little beat him and tortured his sexual organs, that his mother routinely had full intercourse with him beginning when he was ten years old, and that she prostituted Middlebrooks to men who would orally or anally rape him. Middlebrooks also provides a new diagnosis of PTSD. The critical question in our Sixth Amendment analysis is whether trial counsel were ineffective in failing to bring out these additional details.

We do not reach this question, however, because we conclude that Middlebrooks has procedurally defaulted Claim 9(b). As with Claim 9(a), Middlebrooks failed to brief this issue on appeal of the denial of his petition for postconviction relief, and the appeals court denied relief based on Tennessee Court of Criminal Appeals Rule 10(b) and Tennessee Rules of Appellate Procedure 27(a)(7) and 27(g). For the reasons discussed above, this procedural ruling was an independent and adequate state ground for denying the claim. Middlebrooks makes no attempt to demonstrate cause and prejudice or to argue that he meets the miscarriage-of-justice exception. The doctrine of procedural default therefore bars federal habeas review.

### 3. Failure Adequately to Prepare for the Testimony of Dr. Jeffrey Smalldon

In Claim 9(e) of his habeas petition, Middlebrooks argues that trial counsel provided ineffective assistance in either putting Dr. Smalldon on the stand or failing to prepare him to provide stronger testimony and avoid being devastated on cross-examination. Middlebrooks did not address this claim in his opening brief here. Even after the State pointed out the omission, Middlebrooks failed to argue the claim in his reply brief. The issue is therefore abandoned. *Geboy v. Brigano*, 489 F.3d 752, 766–67 (6th Cir. 2007).

### 4. Failure to Investigate and Present Evidence of the Relative Dominance of Roger Brewington

In Claim 9(hh) of his habeas petition, Middlebrooks argues that his trial counsel provided ineffective assistance by failing to present mitigating evidence of Brewington's dominance over Middlebrooks in Majors's murder. Because the Tennessee Court of Criminal Appeals resolved this claim on the merits on postconviction review, it is properly before us. The state court declined to decide whether trial counsel's performance was deficient and rejected the claim based on lack of prejudice. Therefore, we review the performance prong of the claim de novo but the prejudice determination under AEDPA deference.

Middlebrooks's sentencing jury did hear some evidence that Brewington was the leader in the murder. This evidence came in through Middlebrooks's videotaped confession and Dr. Smalldon's testimony. In the confession, Middlebrooks described Brewington as the leader, recounting that Brewington dragged Majors into the woods, tied his hands and beat him with brass knuckles, tortured his genitals, repeatedly dropped a knife on him, and urinated in his mouth. Middlebrooks explained that Brewington challenged him to stab Majors and that after refusing initially, Middlebrooks did so only after Brewington first stabbed Majors. Middlebrooks claimed that he stabbed Majors to prove himself to Brewington and to end Majors's ordeal. Middlebrooks also said that he did not stop Brewington from torturing Majors because he was afraid of Brewington. Dr. Smalldon confirmed that Middlebrooks claimed to have stabbed Majors under

pressure from Brewington and that he feared Brewington. Dr. Smalldon also reported that, according to Middlebrooks, Brewington told Majors that he would sacrifice Majors to Satan. Based on his examinations, Dr. Smalldon further opined that Middlebrooks had a weak personality and could be egged on to commit crimes. In addition to advancing this evidence, trial counsel touched briefly on the relative-dominance theory of mitigation in closing argument, stating that "[o]nly when Roger Brewington, bigger, not as old in the point of chronology, but when Roger Brewington shows up, that is when the trouble starts." J.A. at 926.

During postconviction proceedings, Middlebrooks advanced several additional pieces of evidence supporting his relative-dominance theory of mitigation. These included (1) a 1987 report by clinical psychologist Kenneth Anchor who examined Brewington and wrote that Brewington had "poor impulse control," "unsocialized, aggressive behavior," and a "volatile temperament" and that Brewington showed no remorse for his role in Majors's murder, J.A. at 1488–89; (2) foster care records repeatedly citing Brewington's tendency to manipulate others and "to dominate the other students," J.A. at 1491; (3) testimony by a police officer at Brewington's trial that Brewington appeared to be twenty or twenty-five years old and that Brewington showed no remorse for his actions; (4) a signed statement by Brewington swearing to serve the devil; (5) racist cartoons and writings by Brewington; (6) documentation that Brewington assaulted a juvenile detention center officer in 1987; (7) admissions from Brewington that he was under the influence of cocaine and had consumed a case of beer the day of the murder; and (8) Brewington's presentence report, reflecting the State's argument for a sentencing enhancement because "it is obvious that the actual acts which the defendant admitted inflicting upon the victim showed him to be a leader and not a follower," J.A. at 1474. In addition, psychologist Dr. Jay Woodman testified at the postconviction evidentiary hearing based on a prison interview with Brewington that Brewington had a "domineering" personality and was "impervious to peer criticism or peer pressure." Postconviction Hr'g Tr. at 129, 131 (Dist. Ct. Doc. 22, Addendum 6). Dr. Woodman, who had also examined Middlebrooks, testified that "Middlebrooks would be much more likely to follow someone else's lead." *Id.* at 132.

Middlebrooks's trial counsel testified at the postconviction evidentiary hearing that they knew that Brewington looked older than he was, that they were aware of Dr. Anchor's report, that they had seen some but not all of Brewington's social-history documents, and that they had reviewed the transcripts of Brewington's trial. Although counsel intended to emphasize at resentencing that, "of the players involved, [Middlebrooks] was the lesser player," J.A. at 1240, they did not present all of the evidence of Brewington's relative dominance that they did uncover or seek more evidence because they were concerned that the State would call Brewington to the stand in rebuttal. That is, trial counsel made a strategic decision not to investigate and present further evidence of Brewington's dominant role in the murder. The record provides a basis for counsel's concern about provoking harmful testimony from Brewington. Brewington had given a statement to the police indicating that Middlebrooks told Majors to remove his clothes, that Middlebrooks made the decision to kill Majors, and that Middlebrooks was responsible for both stabs to Majors's body. *See Middlebrooks*, 2003 WL 61244, at *4. Moreover, Brewington maintained at his own trial that Middlebrooks had dropped the knife on Majors, seemed to enjoy himself while tormenting Majors, and did all of the fatal stabbing. In light of these facts, we conclude that Middlebrooks has not overcome the presumption that trial counsel's strategy was reasonable. *Strickland*, 466 U.S. at 689.

Middlebrooks makes a second, more compelling argument that his trial counsel rendered constitutionally ineffective assistance. At the postconviction hearing, Middlebrooks's trial counsel testified that they likely had not seen Brewington's presentence report and did not know that the State had requested a leadership enhancement for Brewington. Middlebrooks contends that had the jury been informed (1) that the State had sought a sentencing enhancement based on role at Brewington's sentencing, and (2) that Brewington received a life sentence, the jury would not have returned the death penalty.

This argument is not without force. Under *Lockett v. Ohio*, 438 U.S. 586 (1978), a sentencing jury is able to consider "as a mitigating factor, any aspect of a defendant's

character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 604 (emphasis omitted). Ohio has opened the field even more widely than required by *Lockett*, specifying as mitigating "[a]ny other factors that are relevant to the issue of whether the offender should be sentenced to death." Ohio Rev. Code § 2924.04(B)(7). And the Supreme Court has recognized that some states treat the universe of mitigation evidence as encompassing information that a more culpable co-defendant received a lighter sentence. *See Parker v. Dugger*, 498 U.S. 308, 314–16 (1991) (describing fact that co-defendant pleaded guilty to second-degree murder as proper mitigation evidence in Florida); *see also Meyer v. Branker*, 506 F.3d 358, 375–76 (4th Cir. 2007) (holding that states may, but are not constitutionally required to, permit consideration of such evidence as mitigating); *Beardslee v. Woodford*, 358 F.3d 560, 579 (9th Cir. 2004) (same). Thus, counsel's failure to inform the jury that the prosecution viewed Brewington as the chief perpetrator and that Brewington received a life term might have constituted deficient performance.

Furthermore, the argument is not vitiated by the fact that minors were ineligible for the death penalty in Tennessee at the time of Brewington's sentencing. *See* Tenn. Code Ann. § 37-1-134(a)(1). The jury might have judged Middlebrooks to be less death-worthy than Brewington, and it might have opted to sentence Middlebrooks to life to avoid the injustice of punishing the follower more severely than the leader.

Even if Middlebrooks's counsel rendered deficient performance in failing to highlight the State's view of Brewington, however, we cannot say that that failure prejudiced Middlebrooks in the constitutional sense. The prosecution put on substantial evidence in support of a death sentence, emphasizing the evidence that Majors was tortured for hours before dying: bruises, lacerations, and burns covered his body; the perpetrators had urinated in his mouth; a knife had been dropped on him repeatedly; an "X" with a vertical line through it had been carved into Majors's chest while he was still alive; and the two stab wounds caused him to bleed to death while he was still conscious. Middlebrooks presented some evidence that Brewington was the leading figure in the murder (in addition to other mitigation evidence concerning Middlebrooks's mental

health).  The additional evidence that even the State considered Brewington the leader and that Brewington received a life sentence certainly would have buttressed Middlebrooks's case for life, but the issue is whether there is a reasonable probability that it would have led the jury ultimately to choose life over death.  *Strickland*, 466 U.S. at 694.  The Tennessee Court of Criminal Appeals answered that question in the negative.  It concluded that "no degree of finger-pointing to the sixteen-year-old co-defendant would have affected the jury's verdict in light of the hours of torture to the young victim which ended when the petitioner viciously stabbed the victim." *Middlebrooks*, 2003 WL 61244, at \*11.  Constrained by AEDPA, we must affirm because we cannot say that the state court's application of *Strickland*'s prejudice prong was unreasonable.

## C.  Confrontation Clause

In Claim 9A(b) of his habeas petition, Middlebrooks asserts that his Confrontation Clause rights were violated when, during the guilt phase,[1] the trial court refused to allow defense counsel to examine records of prosecution witness Shannon Stewart's admission to a psychiatric hospital.  Stewart witnessed Majors's abduction and testified to his observations.  Middlebrooks raised the concern that Stewart's recall and retelling of the abduction were unreliable, and Middlebrooks sought access to the hospital records for impeachment.  The trial judge refused to review the records in camera.  The Tennessee Supreme Court held that although the trial court should have reviewed the records, it committed no reversible constitutional error in declining Middlebrooks access to them.  *Middlebrooks*, 840 S.W.2d at 332–33.

"[A] primary interest secured by [the Confrontation Clause] is the right of cross-examination."  *Douglas v. Alabama*, 380 U.S. 415, 418 (1965).  Thus, "a criminal defendant states a violation of the Confrontation Clause by showing that he was

---

[1]Middlebrooks also pleads his Confrontation Clause claim with respect to the resentencing proceeding, arguing that his right to confront Stewart was frustrated at that stage for the same reason. Because Middlebrooks did not raise the Confrontation Clause issue with respect to the resentencing proceeding in state court, the issue is procedurally defaulted. *See Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).

prohibited from engaging in otherwise appropriate cross-examination designed . . . 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986) (quoting *Davis v. Alaska*, 415 U.S. 308, 318 (1974)). In reviewing Confrontation Clause claims under this standard, the key is "whether the jury had enough information, despite the limits placed on otherwise permitted cross-examination, to assess the defense theory." *Stewart v. Wolfenbarger*, 468 F.3d 338, 347 (6th Cir. 2007) (internal quotation marks omitted).

The Tennessee Supreme Court stated that the trial court's failure to review the records in camera "was error" but concluded that this "error was harmless." *Middlebrooks*, 840 S.W.2d at 333. The court did not find a violation *of the Confrontation Clause*, however. Rather, it concluded that "the defendant was not denied the opportunity 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" *Id.* (quoting *Davis*, 415 U.S. at 318). Because the Tennessee Supreme Court rejected Middlebrooks's claim on the merits, we apply AEDPA deference. We conclude that the state court's decision did not involve an unreasonable application of clearly established federal law.

As an initial matter, we disagree with the state court's characterization of Stewart's records as involving "essentially behavioral problems." *Middlebrooks*, 840 S.W.2d at 333. The records discuss deficiencies that might have impacted Stewart's reliability as an eyewitness, including "signs of neuropathology," "mild to moderate range of impairment," "below average intellectual abilities," and significant impairment in "[c]omprehension, social judgment, and common[]sense." J.A. at 984–85.

It is undisputed, however, that the trial court did not limit Middlebrooks's ability to cross-examine Stewart in the sense of preventing certain lines of questioning. Middlebrooks's attorneys had ample opportunity to present their theory of mitigation, and, in fact, they were able to impeach Stewart's credibility. Stewart's strongest contribution to the prosecution's case was his testimony that once Brewington caught hold of Majors, Middlebrooks told Majors, "Shut up, nigger" and struck Majors in the

face.  These facts bore on Middlebrooks's role in the attack and his possible racist motive.  On cross-examination, defense counsel brought out that Stewart had not told the police about the racial slur when he was first interviewed and, further, that Stewart had testified at Brewington's trial that *Brewington* was the one who struck Majors.  Of course, Middlebrooks wanted to impeach Stewart in yet another way:  he wanted to use the hospital records to question Stewart's reliability on psychiatric grounds.  But as the Tennessee Supreme Court pointed out, "there is nothing in the trial record to demonstrate that defense counsel was prevented from asking Stewart about his hospitalization."  *Middlebrooks*, 840 S.W.2d at 333.

That said, it is likely that such a line of questioning would have been more robust had counsel seen the records and known what to ask.  In this vein, Middlebrooks argues that the scope of his examination of Stewart *was* limited—by his inability to conduct a more effective cross-examination.  In light of the Supreme Court's decision in *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987), this argument is not a basis for habeas relief.  In that case, George Ritchie, accused of sexually assaulting his thirteen-year-old daughter, claimed that the trial court violated the Confrontation Clause when it denied his motion to compel a state agency charged with investigating child abuse to turn over its records concerning his case.  Ritchie argued "that he could not effectively question his daughter because, without the [agency] material, he did not know which types of questions would best expose the weaknesses in her testimony."  *Id.* at 51.  The plurality rejected the claim, explaining that "the right to confrontation is a *trial* right" and declining "to transform the Confrontation Clause into a constitutionally compelled rule of pretrial discovery."  *Id.* at 52.  The plurality stated that "[t]he ability to question adverse witnesses . . . does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony.  Normally the right to confront one's accusers is satisfied if defense counsel receives wide latitude at trial to question witnesses."  *Id.* (footnote omitted).  Because the trial court permitted Ritchie's attorney to cross-examine Ritchie's daughter with no limitations aside from routine evidentiary rulings, it did not impinge on his confrontation rights.  *Id.* at 46, 54.

*Ritchie* was only a plurality opinion, and we cannot predict whether the Supreme Court will extend the Confrontation Clause to cover discovery requests under some circumstances. It is clear, however, that for now there is no clearly established federal law indicating that the trial court's failure to order disclosure of Stewart's hospital records violated Middlebrooks's confrontation rights. Here, as noted above, Middlebrooks's trial counsel received wide latitude to question Stewart. Accordingly, we lack grounds to hold that the Tennessee Supreme Court's resolution of this claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1).

## D. Prosecutorial Misconduct

Finally, in Claims 13(c) and 13(d) of his habeas petition, Middlebrooks alleges that the State violated his right to due process when the prosecutor asked the jury during closing argument to return a verdict of death based on the victim's family's wishes and because the Bible required it. Specifically, the prosecutor told the jury:

> [Majors's] family asks you to impose the death penalty. The State asks you to impose the death penalty. The facts support it. He deserves it. Justice demands it on the facts and the law.
>
> [Defense counsel] has asked you to consider something else. He has asked you to consider the book where the words of our Lord are written, vengeance is mine.
>
> This lady has come to the courtroom, not for vengeance, but to turn this over to you, the law. If she was after vengeance, this case would have never made it here.
>
> The same book that says vengeance is mine says whoever sheddeth man's blood, whoever sheddeth man's blood, then by man shall his blood be shed. The Lord meant for the system of laws and justice to govern societies wherever they are, and you are that tool of the Lord, that part of justice—.

J.A. at 939–40. To prevail on a due-process claim based on prosecutorial misconduct, Middlebrooks "must demonstrate that the prosecution's conduct was both improper and so flagrant as to warrant reversal." *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005). On direct appeal of Middlebrooks's resentencing, the Tennessee Supreme Court concluded

that both classes of statements were improper but that they did not require reversal because they did not affect the jury's verdict. *Middlebrooks*, 995 S.W.2d at 557–61. Because the state court rejected Middlebrooks's claims on the merits, our review is constrained by AEDPA.

We agree with the Tennessee Supreme Court that the prosecutor's remarks about the victim's family and the prosecutor's references to the Biblical basis for capital punishment were highly improper. The comments "were completely out of bounds, textbook examples of what a prosecutor should *not* be permitted to say during closing argument." *Shafer v. Wilson*, 364 F. App'x 940, 949 (6th Cir. 2010) (unpublished opinion). Thus, the only question is whether the comments were flagrant enough to violate the Constitution, that is, whether they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks omitted). To determine flagrancy, we consider four factors: "(1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant." *Bates*, 402 F.3d at 641. The state court applied a set of factors consistent with these and thus not contrary to the standard set out in *Darden*. We may vacate Middlebrooks's sentence, therefore, only if the state court's conclusion was unreasonable.

Upon review, we cannot say that it was. Two of the four factors weigh in Middlebrooks's favor. Both sets of statements by their very nature tended to focus the jury on impermissible considerations, and the fact that the statements came together, one after the other, likely increased their influence. In addition, the statements were deliberately made: the prosecutor mentioned the victim's family's wishes soon after stating that "[w]hat happened in this case is every mother's worst nightmare," and just before stating that "[t]his lady has come to this courtroom . . . to turn this case over to you, the law." J.A. at 938–40. "This lady" referred to Majors's mother, who, according to Middlebrooks, sat at the prosecution's table throughout the trial. The prosecution

invoked the Bible, meanwhile in a deliberate (and overdone) response to a Biblical allusion by defense counsel.

The other two factors weigh in favor of upholding Middlebrooks's sentence. The prosecutor's comments were relatively isolated, appearing within the same three pages of the transcript. *See United States v. Benson*, 591 F.3d 491, 499–500 (6th Cir. 2010) (holding that improper comments were isolated when prosecutor made two references to co-defendants' guilty pleas during closing argument). More importantly, the overall weight of the evidence supporting the prosecution's case for death was substantial. In the state court's words:

> The circumstances of the offense were shocking in their gruesomeness, brutality, and inhumanity. Medical evidence established the nature and severity of the injuries, bruises, cuts, abrasions, and wounds suffered by the victim. The victim was beaten and cut in the face, mouth, body, legs, and testicles. The evidence further indicated that an "X" had been carved into the victim's chest before his death from stab wounds. The victim was alive and conscious for much of the abuse inflicted upon him, and was conscious and alive for a period of time after being stabbed.
>
> Middlebrooks by his own admission fully participated in the capture of Kerrick Majors and in the infliction of severe physical and mental pain to the victim by acts of unimaginable cruelty, despite the young victim's pleas for his life. Finally, after three to four hours of repeated sadistic acts, Middlebrooks stabbed the victim.
>
> The evidence was overwhelming in support of the jury's findings that the State had proven this aggravating circumstance beyond a reasonable doubt and that this evidence was not outweighed by evidence of mitigating factors.

*Middlebrooks*, 995 S.W.2d at 560.

To reiterate, we do not have occasion to decide whether these factors indicate that the prosecutor's comments were flagrant. Instead, we ask only whether the state court's conclusion that they were not flagrant was unreasonable, and to that question we answer "no." In reaching this conclusion, we note that we are constrained in part by *Coe v. Bell*, 161 F.3d 320 (6th Cir. 1998), in which a panel of this court held that

prosecutorial references to the Bible nearly identical to those in the instant case did not so taint the proceedings as to require reversal. *See id.* at 351. Accordingly, habeas relief is unwarranted.

## III. CONCLUSION

For the foregoing reasons, we conclude that the district court correctly determined that Middlebrooks's claims are either procedurally defaulted or do not provide a basis for vacating his death sentence under the strictures of AEDPA. We therefore **AFFIRM** the district court's order denying Middlebrooks's petition for a writ of habeas corpus.